# IN THE SUPREME COURT
# STATE OF NORTH DAKOTA

### 2025 ND 36

In the Matter of the Guardianship and Conservatorship of G.I.C.

| | |
|---|---|
| M.J.C, M.P.C, and G.D.T., | Petitioners |
| v. | |
| M.C., | Respondent and Appellant |
| and | |
| Lutheran Social Services of Minnesota, | Respondent |
| and | |
| M.I.R., | Interested Party |
| and | |
| Bremer Trust NA, | Respondent and Appellee |

### No. 20240146

Appeal from the District Court of Sargent County, Southeast Judicial District, the Honorable Daniel D. Narum, Judge.

REVERSED AND REMANDED.

Opinion of the Court by Tufte, Justice.

Berly D. Nelson (argued) and Ian R. McLean (on brief), Fargo, N.D., for respondent and appellant.

Brian A. Dillon, Marya P. Robben, and Richard C. Landon, Minneapolis, Minnesota, for respondent and appellee; submitted on brief.

**Tufte, Justice.**

[¶1]   This is an appeal from a district court order directing distribution of trust assets in equal shares to the Appellant ("Luke," a pseudonym) and his four siblings. The parties dispute how remaining trust assets should be distributed when the trust agreement provides for specific distributions of land but that land was sold to fund the trust before its termination. Luke argues that each beneficiary is entitled to a share of the liquidated assets proportionate to the value of the specific distributions of land the beneficiary would have received had the land not been sold. The trustee, Bremer Trust, and Luke's siblings contend that the district court properly ordered equal distribution of the liquidated assets because distribution of land was impossible, and the trust agreement reflects an overall intent to treat the beneficiaries equally. We reverse and remand for redistribution of the trust assets proportionate to the value of the specific distributions of land.

I

[¶2]   This case centers on interpretation of a trust agreement and its provisions governing distribution of assets upon termination of the trust. In 1997, G.I.C. and her husband ("Trustors") executed the Revocable Living Trust Agreement, naming themselves as trustees and transferring several parcels of farmland to the trust. The trust agreement provides the Trustors the primary benefit of the trust's income and principal during their lifetimes. Upon the death of either Trustor, article III of the trust agreement directs the surviving trustee to divide the trust property into two trusts: Trust A and Trust B. The trust agreement directs that all income from both trusts be paid to the surviving spouse during the surviving spouse's lifetime. Upon the death of the surviving Trustor, the trust agreement identifies the couple's five children as beneficiaries of the trust.

[¶3]   The issue before the Court is whether equal distribution of liquidated trust assets is consistent with article III, §§ 4–7 of the trust agreement:

4. Upon the death of the surviving Trustor, the remaining principal, and any undistributed income in this trust, shall be distributed to our children, and or their heirs, except for the real property which shall be held subject to the provisions contained in Sections[1] 6, 7, and 8[2] below.

5. Following the death or incapacity of the original Trustors, the successor Trustees shall allow [John, a pseudonym] and [Luke] to farm the real property owned by the trust so long as [John] and [Luke] farm as partners. As long as the real estate is farmed by the partnership, the partnership shall have no duty to account to the Trustee for rent, except for payment of real estate taxes and the payments referred in paragraph[3] 6, below.

6. The farming partnership shall be responsible for making any mortgage payments which are due from time to time. Following payment in full of any mortgage on real estate, the partnership shall pay [the other three siblings], rent for that property to be transferred to them under paragraph 8 hereof; in an amount equal to the average, like kind, rent for property of similar value and use in the vicinity.

7. Following the death of the original Trustors,[4] if the [John - Luke] partnership ceases, farming operations shall terminate and the property shall be distributed as follows:

   A. The South 120 acres of the Southeast Quarter of Section 14, Township 129, Range 59, Dickey County, North Dakota – to [John].

   B. All of Section 24, Township 129, Range 59, Dickey County, North Dakota – [John] and [Luke], as tenants in common.

---

[1] The Trust Agreement uses "section" and "paragraph" interchangeably.

[2] The Trust Agreement does not include a § 8 nor ¶ 8 under article III or any other article. The parties do not address this apparent mistake in the Trust Agreement, and nowhere in the record is it otherwise mentioned.

[3] Here, the Trust Agreement switches to "paragraph" in reference to § 6.

[4] The district court modified article III, § 7 of the Trust Agreement in 2017, adding "Following the death of the original Trustors" as prefatory language to make clear that § 7 is operative only upon the death of both Trustors.

C. All of Section 31, Township 129, Range 58, containing the farmstead and three irrigator systems, located in Sargent County, North Dakota – to [Luke].

D. The Southeast Quarter of Section 1, and the Northeast Quarter of Section 23, Township 129, Range 59, Dickey County, North Dakota – to [G.D.T.] – 25%, [M.I.R.] – 25% and [M.P.C.] – 50%, as tenants in common.

[¶4] Upon the death of either Trustor, the trust agreement directs the surviving trustee to divide the trust property into two trusts, Trust A and Trust B. Trust B ("the Trust") is at issue here. The trust agreement directs that all income from both trusts be paid to the surviving spouse during the surviving spouse's lifetime. Upon the death of the surviving Trustor, the trust agreement identifies the couple's five children as beneficiaries of the Trust.

[¶5] G.I.C.'s husband died in 2007, triggering article III of the trust agreement and leading to creation and funding of the Trust. In 2016, three of Luke's siblings petitioned the district court for: (1) appointment of the fourth sibling as guardian of G.I.C.; (2) appointment of Bremer Trust as conservator; (3) construction and modification of the trust agreement; (4) removal of trustees; and (5) appointment of successor trustees. The petition alleged that G.I.C. was suffering from dementia and in need of a guardian. The petition also alleged that Luke was taking advantage of G.I.C.'s vulnerability to his financial benefit by appropriating trust property and income, rendering G.I.C. unable to pay her bills.

[¶6] In 2017, following a two-day hearing, the district court granted the petition. The district court found that G.I.C. was an incapacitated person needing a guardian. The district court also found that she was unable to make prudent financial decisions and appointed Bremer Trust as successor trustee and conservator of her estate. The court found that "the land contained in the Trust is being used at below market rent," and "the evidence suggests that the assets in the trust, which consists of several tracts of farmland and pasture, have not been managed by the trustees in the most economically prudent manner for the proposed ward and it is in the best interest of [G.I.C.] that an independent

Conservator and Successor Trustee be appointed to properly manage all future financial matters of [G.I.C.]'s estate and Trust."

[¶7] Although article IV of the trust agreement provided that, upon the death or incapacity of both Trustors, their sons Luke and John would serve as successor co-trustees alongside the attorney who had drafted the trust agreement, the district court removed G.I.C.'s sons and attorney as trustees under N.D.C.C. § 59-15-06. In addition to Luke's alleged pattern of financial abuse, the district court found that Luke and John were unable to effectively communicate, rendering them incapable of serving as co-trustees. Luke and John were involved in separate litigation over the dissolution of their farming partnership. Luke and John had farmed the family's land alongside their father until his death in 2007. The sons continued the farming operation through the 2013 crop year, but terminated the partnership due to their acrimonious relationship.

[¶8] Bremer assessed the Trust as asset-rich but cash poor. Because the Trust's purpose was to fund G.I.C.'s increasing need for care and comfort, Bremer petitioned the district court for authorization to sell the Trust's real estate to fund the Trust. Luke opposed the petition, and after a hearing during which all five children expressed their desire to avoid selling the land, the court directed Bremer to pursue alternative financing for G.I.C.'s care rather than selling the Trust's real estate. The court released Bremer from liability related to the children's decision to delay sale of the land, noting: "The decision to obtain financing rather than sell real estate will entail certain ramifications or potential ramifications, including costs for financing, the delayed final decision regarding long-term treatment of real estate, any estate planning impact related to obtaining financing, and any market changes related to the value of the land."

[¶9] Bremer repeatedly sought to sell the Trust's land to fund the trust and provide for G.I.C.'s care, and each time Luke opposed the sale. In July 2023, the district court authorized Bremer to sell the real estate, finding:

> [ . . . ] Selling the real estate is the most reasonable and prudent course of action at this juncture given the economic reality facing the Trust and Conservatorship. At the Court's direction and with the encouragement of the interested parties, Bremer has borrowed

4

against real estate owned by the Trust for many years in order to create and maintain the liquidity necessary to pay Trust and Conservatorship expenses, including [G.I.C.]'s care costs. Bremer has liquidated almost all other assets owned by the Trust and Conservatorship in order to defer selling the real estate. Selling the real estate is now necessary and appropriate in order to satisfy the outstanding debts of the Trust and Conservatorship, and to create and maintain the liquidity necessary to pay for ongoing Trust and Conservatorship expenses, including [G.I.C.]'s care costs.

The Court recognizes that at [G.I.C.]'s death, the Trust devises specific parcels of real estate owned by the Trust to certain of [G.I.C.]'s children, and that selling some but not all of the real estate would have a disparate impact on [G.I.C.]'s children under the Trust. Under these circumstances, the Court believes it is reasonable and prudent to sell all of the real estate owned by the Trust, to deposit the net proceeds into the Trust account, and to distribute whatever assets remain in the Trust at [G.I.C.]'s death among the Trust beneficiaries in a fair and equitable manner.

[¶10] After a public auction, Bremer entered into purchase agreements for the Trust's land. G.I.C. died in November 2023. The sales did not close until December 2023.

[¶11] In February 2024, Bremer petitioned the district court for approval of its final account, discharge as conservator, an order directing trust distribution, and termination of trust. In its petition, Bremer requested that the district court order distribution of remaining trust assets in five equal shares to the siblings. Luke opposed the petition, arguing that each beneficiary is entitled to the net proceeds from the sale of the specific farmland parcels the beneficiary would have received had that land not been sold. Bremer responded that it recommended equal distribution of remaining trust assets because distribution of specific parcels was no longer possible, and the trust agreement otherwise manifests a general intent to treat the Trustors' children equally.

[¶12] The district court granted Bremer's petition, adopting Bremer's interpretation of the trust agreement and ordering equal distribution of remaining Trust assets among the five children. Luke appeals the district court's

5

order, requesting that this Court reverse and remand with instructions to distribute remaining Trust assets proportionate to the net proceeds of the specific farmland parcels each beneficiary would have received had that land not been sold.

## II

## A

[¶13] The issue before the Court is whether equal distribution of liquidated trust assets is consistent with the Trustors' intent as expressed in the trust agreement. "Our primary objective in construing a trust instrument is to ascertain the settlor's intent. When a trust instrument is unambiguous, the settlor's intent is ascertained from the language of the trust document itself." *Matter of Michael J. Tharaldson Irrevocable Trust II*, 2023 ND 2, ¶ 6, 984 N.W.2d 375. "An ambiguity exists when rational arguments can be made in support of contrary positions as to the meaning of the term, phrase, or clause in question. Whether a trust agreement is ambiguous is a question of law, fully reviewable on appeal." *Dwyer v. Sell*, 2021 ND 139, ¶ 8, 963 N.W.2d 292.

[¶14] When construing trust agreements, we apply our general rules of construction for written documents:

> General rules of construction of written documents apply to the construction of trust instruments. In North Dakota, the interpretation of a contract is governed by N.D.C.C. ch. 9-07. Under N.D.C.C. § 9-07-02, the contract language governs its interpretation "if the language is clear and explicit and does not involve an absurdity." Contracts are construed to give effect to the parties' mutual intention at the time of contracting "so far as the same is ascertainable and lawful." N.D.C.C. § 9-07-03. The rules provided in N.D.C.C. ch. 9-07 are applied "[f]or the purpose of ascertaining the intention of the parties to a contract, if otherwise doubtful . . . ." N.D.C.C. § 9-07-03. "When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone if possible, subject, however, to the other provisions of [N.D.C.C. ch. 9-07]." N.D.C.C. § 9-07-04. "The whole of a contract is to be taken

6

together so as to give effect to every part if reasonably practicable. Each clause is to help interpret the others." N.D.C.C. § 9-07-06.

"A contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties." N.D.C.C. § 9-07-08. "Particular clauses of a contract are subordinate to its general intent." N.D.C.C. § 9-07-15. "Repugnancy in a contract must be reconciled, if possible, by such an interpretation as will give some effect to the repugnant clause subordinate to the general intent and purposes of the whole contract." N.D.C.C. § 9-07-17. "Words in a contract which are inconsistent with its nature or with the main intention of the parties are to be rejected." N.D.C.C. § 9-07-18.

*Tharaldson Irrevocable Tr. II*, 2023 ND 2, ¶ 6.

B

[¶15] Luke argues that the trust agreement demonstrates Trustors' intent to leave him the majority of the Trust's land. Bremer contends that distribution of the specific parcels was no longer possible, and the trust agreement does not provide express direction on how remaining Trust assets should be distributed if the land were liquidated. Despite the specific distributions in article III, § 7, "Bremer read[s] the Trust in its totality to reflect an intent of attempting to treat the children equally, regardless of whether farmland is available for distribution." Bremer argues that article III, §§ 4 and 6 show that the Trustors generally intended their children to benefit equally from the Trust. Section 4 provides that all Trust assets—except the specific land distributions under § 7—are to be distributed equally among the children. Section 7 provides for specific distributions of the land, but only if the Luke-John farming partnership were to terminate. Section 6 provides that the other three children would receive market value rent for the partnership's use of the Trust's land.

[¶16] Bremer underscores that equal distribution of proceeds from sale of the Trust's land offsets the fact that the delayed sale affected the value of other Trust assets:

7

> Because the Interested Parties all desired that the Trustee delay selling the farmland, the court ordered Bremer to liquidate all other assets of the Trust before selling the farmland. This decision also had consequences for what was available to eventually distribute to the beneficiaries—indeed, there can be no dispute that had the land been sold sooner, other Trust assets would have remained to be distributed in equal shares after [G.I.C.]'s death.

The parties agree that under article III, § 4, the remaining trust assets, minus the specific distributions of § 7, are to be distributed equally among the five children. The delay in sale of the land required Bremer to liquidate all other trust assets to pay for G.I.C.'s care. Those assets would have been distributed equally among the children.

[¶17] Bremer determined that because article III, § 7 designates each parcel to different children, it would not be fair to sell one parcel at a time as additional funds were needed for G.I.C.'s care. There is no dispute that the value of the land designated for each child varies greatly. Immediately before the sale, the children stood to receive property interests having significantly different values. After the sale, Bremer determined that the five children now stood to receive equal shares of the proceeds.

[¶18] Although the trust agreement does not provide express direction on how remaining trust assets should be distributed if the land is liquidated, it does provide terms of final distribution of Trust assets among the five children if the Luke-John farming partnership dissolves. The Trustors' primary intent was for the Trust to provide for their care and support during their lifetimes. Secondary to providing for their care and support was the Trustors' intent that upon their deaths, Luke and John would farm the Trust's land as a partnership and pay the other three children fair market rent for the partnership's use of the land. Although article III, §§ 5 and 6 demonstrate the Trustors' hope and intent that all children would benefit from the Trust's land, the trust agreement clearly contemplated dissolution of the farming partnership and final distribution of the land among the children. Section 7 provides, upon dissolution of the farming partnership, that each parcel be distributed to specific children. It is most consistent with Trustors' intent as expressed in the trust agreement that each

child receives a share of the land sale proceeds proportionate to the value of the child's specific distributions. We leave determination of the ultimate distribution for the district court.

C

[¶19] Because we remand for redistribution of the Trust assets proportionate to the value of the specific distributions of land, we need not address the argument that N.D.C.C. § 30.1-09-08 ("Nonademption of specific devises – Unpaid proceeds of sale, condemnation, or insurance – Sale by conservator") requires that Luke receive the net proceeds from the sale of the parcels specifically distributed to him in the trust agreement.

III

[¶20] We reverse and remand for redistribution of Trust assets proportionate to the value of specific distributions of land.

[¶21] Jon J. Jensen, C.J.
 Daniel J. Crothers
 Lisa Fair McEvers
 Jerod E. Tufte
 Douglas A. Bahr